Filed 12/28/15  C.T. v. Superior Court CA4/3

**NOT TO BE PUBLISHED IN OFFICIAL REPORTS**

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FOURTH APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| C.T. et al.,<br><br>        Petitioners,<br><br>                v.<br><br>THE SUPERIOR COURT OF ORANGE COUNTY,<br><br>        Respondent;<br><br>ORANGE COUNTY SOCIAL SERVICES AGENCY et al.,<br><br>        Real Parties in Interest. | G052604<br><br>(Super. Ct. No. DP025529)<br><br>O P I N I O N |

Original proceedings; petitions for a writ of mandate/prohibition to challenge orders of the Superior Court of Orange County, Dennis J. Keough, Judge. Petitions denied.

David Christopher Bell for Petitioner C.T.

Law Offices of Arthur J. LaCilento and Arthur J. LaCilento for Petitioner M.F.

Frank Ospino, Public Defender, Laura Jose, Assistant Public Defender, Hong T.L. Nguyen and Dennis M. Nolan, Deputy Public Defenders for Petitioner R.D.

No appearance for Respondent.

Leon J. Page, County Counsel, Karen L. Christensen and Aurelio Torre, Deputy County Counsel for Real Party in Interest Orange County Social Services Agency.

Law Office of Harold LaFlamme and Jess Ann Hite for Minor A.D.

\*          \*          \*

This opinion involves three petitions that arise from two separate rulings at a six-month status review hearing in a juvenile dependency matter concerning one-year-old minor A.D. (the child). C.T., the child's mother, challenges the juvenile court's order terminating reunification services and setting a permanent plan hearing. (Welf. & Inst. Code, § 366.26; all further undesignated statutory references are to this code.) M.F., the child's paternal grandmother, challenges two orders: (1) The denial of her petition to modify the child's placement (§ 388); and (2) the grant of real party in interest Orange County Social Services Agency's (SSA) request to place the child with R.T., the child's maternal grandmother. R.D., the child's biological father, has filed a separate petition that also challenges the juvenile court's placement rulings. We conclude that all three petitions lack merit and uphold the juvenile court's rulings.

FACTS AND PROCEDURAL BACKGROUND

In July 2014, C.T. and R.D., both of whom are drug users and have criminal records, were arrested and charged with crimes that included kidnapping, mayhem, making criminal threats, torture, and assault with a deadly weapon. At the

2

time, C.T. was pregnant with the child. She gave birth to the child in October while in pretrial custody. C.T. identified R.D. as the child's father. SSA detained the child and placed her in the care of M.F. SSA's detention report and jurisdictional report noted R.D. "has not signed the child's birth certificate and his name is not on the child's birth certificate" and "[h]is mother is not being considered []as a placement at this time."

C.T. informed a social worker that her family lived in Oregon and R.T. was caring for her two children fathered by another man. The half-siblings' father is also a drug user and not involved with the children. The half-siblings have been with R.T. since December 2012 when C.T. and their father voluntarily gave her custody of them. At that time, the half-siblings' father signed a power of attorney, but it has since expired.

SSA filed a dependency petition, alleging failure to protect the child and failure to provide for her support. (§ 300, subds. (b) & (g).) At the detention hearing held one week after the child's birth, the juvenile court ordered the child temporarily placed with SSA. R.D. declined a request for paternity testing. C.T. requested R.T. be evaluated for placement of the child. The court approved the request. SSA confirmed that R.T. was willing to have the child placed in her care and submitted an Interstate Compact for the Placement of Children (ICPC) referral for assessment of her.

Meanwhile, SSA allowed M.F. to remain the child's caretaker. But SSA informed M.F. this arrangement would be temporary if R.T.'s ICPC was approved.

M.F. worked part-time and while at work she left the child at a child care center. SSA reported the child "get[s] along well with the other children at the daycare." Social workers conducted monthly visits with the child and M.F. Their reports uniformly commented that the child appeared healthy and well cared for, and never mentioned any safety concerns about M.F.'s home.

In late October, SSA sent C.T. an incarcerated parent's packet through her attorney and contacted the Orange County jail, inquiring about the availability of services

3

for C.T. and R.D. A jail supervisor sent SSA an e-mail stating the parents were not eligible for services because they were both being held in protective custody.

At the jurisdictional hearing in mid-November, the juvenile court found R.D. to be the child's biological father. Both parents submitted on the petition and the court found its allegations were true. That same month, R.T. traveled to California and had her first visit with the child.

A dispositional hearing was held in January 2015. The court declared the child a dependent and vested custody of her with SSA for suitable placement. Contrary to SSA's recommendation of no reunification services to either C.T. or R.D., the juvenile court ordered that C.T. receive services. Both C.T. and R.D. were authorized to have visitation with the child. At a review hearing in early February, the juvenile court approved SSA's case plan for C.T.

In March, R.T., along with her husband, their other daughter, and the half-siblings traveled to California and had two supervised visits with the child. SSA staff described the maternal relatives as acting appropriate with the child and displaying "lots of love and affection[] by hugs, cuddling, holding and playing with her."

The same month, SSA assigned Yilin Chiou Tzeng as C.T.'s case worker. Tzeng testified she had monthly meetings with C.T. In early April, C.T. signed the case plan. Tzeng provided her with a parenting packet and a letter asking her to review the packet and contact Tzeng if she had any questions. C.T. never returned the packet or asked for other services. At the six-month status review hearing, C.T. admitted receiving a parenting handbook, and while she claimed to have requested parenting classes, acknowledged she "can't take them" or receive other services "because I'm in custody."

In March and April, M.F. filed motions for de facto parent status and a section 388 modification request for placement of the child with her. The juvenile court set these matters to be heard at the time of the six-month status review hearing.

4

In mid-April, SSA received ICPC approval for placement of the child with R.T. Shortly thereafter, C.T. sent SSA a letter requesting that the child be placed with R.T., noting she "ha[d] wanted [the child] in my mother's care since before she was born." SSA filed an application to have the child placed with R.T. The juvenile court ordered this matter be heard in conjunction with the six-month status review hearing.

In June, the maternal grandparents and the child's half-siblings traveled to California and had a four-day, three-night visit with the child. SSA reported "[t]he child . . . made good eye contact with the family members . . . [and] appeared content . . . as evidenced by . . . not crying when the caregiver said bye and left." The child had another overnight visit with her maternal relatives in late July. This "visit was reported to have gone well with no concerns noted."

At the six-month status review hearing, Tzeng recommended terminating reunification services for C.T., stating she had not complied with any part of her case plan. She also recommended placing the child with R.T. She testified SSA always intended to place the child with R.T., but needed to await the outcome of the ICPC. R.T. and her husband had completed parenting classes. According to Tzeng, the child also appeared to have bonded with her half-siblings during the visits. However, Tzeng acknowledged the child had also bonded with M.F. and that both grandmothers had expressed their love and commitment to the child. Tzeng believed that placing the child with R.T. would afford the child "the opportunity to grow up with her [half-]siblings."

Both grandmothers also testified at the hearing. Evidence was presented of critical past behavior by each of them. The juvenile court discounted this evidence, finding "no fault with . . . either grandmother" and declaring that placement with either grandmother would be "appropriate."

On the placement issue, the juvenile court agreed with all of the parties that the child had been well cared for, was healthy, and developing normally in M.F.'s care. The juvenile court further concluded the decision on placement of the child was governed

5

by section 361.3 and that "there is a[n equal] balance between [the grandmothers]" on "many of" the statutory factors.

But the juvenile court held the "crucial" factor was what would be in the child's long-term best interest. Given the sibling relationship factor the court decided it was more appropriate to place the child with R.T., who was caring for her half-siblings. Thus, it granted SSA's placement request and denied M.F.'s section 388 petition.

On the question of whether to continue offering C.T. reunification services, the juvenile court found SSA had provided C.T. with adequate services, but her participation had been minimal to none. It terminated reunification services and scheduled a permanent plan hearing for January 4, 2016. The juvenile court also ordered a paternity test for R.D.

DISCUSSION

1. *The Placement Order*

Both M.F. and R.D. contend the juvenile court abused its discretion by ordering the child placed with R.T.

M.F. argues the child thrived while in her care, she is the only person the child has known as a mother, and that there is a strong psychological and emotional bond between the child and the paternal family. Given the length of time the child has been in her care and the lack of any need for a new placement, M.F. claims the juvenile court erred in relying on section 361.3's relative preference to support its decision. She also contends the child will suffer emotional harm from the juvenile court's placement ruling because the child does not handle change very well and the juvenile court's contrary finding lacks evidentiary support. Finally, M.F. questions the ability of R.T. to properly care for the child.

6

R.D. echoes many of the same arguments. He also contends the juvenile court erred by relying on section 361.3, subdivision (a)(4)'s sibling relationship factor to support its ruling. According to R.D., this factor is limited to the circumstance where the siblings have been removed from the home and that is not the case here. Finally, R.D. claims the juvenile court's placement ruling constituted an adoptive placement and cites our ruling in *In re Lauren R.* (2007) 148 Cal.App.4th 841 for the proposition that "[t]here is no relative placement preference for adoption." (*Id.* at p. 855.)

On the placement ruling, we noted that contrary to a footnote in SSA's opposition, since R.D.'s parental rights have not been terminated, he has standing to challenge this decision. (*In re A.S.* (2012) 205 Cal.App.4th 1332, 1339-1340; *In re Esperanza C.* (2008) 165 Cal.App.4th 1042, 1053-1054.) On the merits, the ruling was "committed to the sound discretion of the juvenile court, and the trial court's ruling should not be disturbed on appeal unless an abuse of discretion is clearly established." (*In re Stephanie M.* (1994) 7 Cal.4th 295, 318.) "'The appropriate test for abuse of discretion is whether the trial court exceeded the bounds of reason. When two or more inferences can reasonably be deduced from the facts, the reviewing court has no authority to substitute its decision for that of the trial court.'" (*Id.* at pp. 318-319.) We conclude M.F.'s and R.D.'s arguments challenging the juvenile court's placement decision are unavailing.

Section 361.3, subdivision (a) provides that "[i]n any case in which a child is removed from the physical custody of his or her parents . . ., preferential consideration shall be given to a request by a relative of the child for placement of the child with the relative . . . ." The statute lists several factors for the child welfare agency and juvenile court to consider "[i]n determining whether placement with a relative is appropriate," including "[t]he best interest of the child," and "[t]he wishes of the parent . . . ." (§ 361.3, subd. (a)(1) & (2).) Another relevant factor is "[p]lacement of siblings and half siblings

7

in the same home, unless that placement is found to be contrary to the safety and well-being of any of the siblings, as provided in Section 16002." (§ 361.3, subd. (a)(4).)

Both M.F. and R.D. argue the best interests of the child is the primary consideration in making a placement decision. Indeed, as noted section 361.3, subdivision (a) lists that as the first factor to be considered in applying the relative placement preference. (§ 361.3, subd. (a)(1). Here, the juvenile court agreed. It noted the "best interests of the child" was "crucially important in this case." But the court also cited the statute's sibling relationship factor (§ 361.3, subd. (a)(4), and concluded the latter factor was not only "of significance in and of itself," but "also of significance in terms of assessing the child's best interests."

M.F. and R.D. attack the trial court's reliance on the sibling relationship factor contained in section 361.3, subdivision (a)(4) to support its decision to place the child with R.T. Their claims lack merit.

R.D. notes subdivision (a)(4) of section 361.3 refers to section 16002 and claims the latter statute applies to only "siblings [who] have been removed from their home." (§ 16002, subd. (a)(1).) He construes section 16002 as limiting the application of section 361.3, subdivision (a)(4)'s sibling relationship factor and argues that since the child's half-siblings were not removed from their home, the juvenile court erred by relying on this subdivision to place her with R.T.

We disagree with this interpretation of the law. "In construing statutes, a court should ascertain the intent of the Legislature so as to effectuate the purpose of the law. . . . [W]e must consider the statutory language in the context of the entire statute and the statutory scheme of which it is a part." (*Anthony J. v. Superior Court* (2005) 132 Cal.App.4th 419, 425; *Renee J. v. Superior Court* (2001) 26 Cal.4th 735, 743.)

Subdivision (a)(4) of section 361.3 requires a court to consider "[p]lacement of siblings and half siblings in the same home, *unless* that placement is found to be contrary to the safety and well-being of any of the siblings, *as provided in*

8

*Section 16002*." (§ 361.3, subd. (a)(4), italics added.) We construe this statute as generally requiring a court to consider placing siblings together, with the latter clause creating an exception for a dependent child if placement of him or her with siblings who have been removed from the home would be contrary to the child's safety and well-being. This construction also comports with the general scope of section 16002, which is intended to enforce the requirement that siblings be placed together or at least have frequent interaction with each other unless it is documented by a child welfare agency and expressly found by the juvenile court to be contrary to their safety and well-being. (§ 16002, subd. (b).) Thus, we reject R.D.'s construction of section 361.3, subdivision (a)(4).

M.F. and R.D. rely on another factor to support their petitions; the ability to provide a stable environment for the child. (§ 361.3, subd. (a)(7)(A).) The juvenile court did consider this factor in making its placement decision, but found both grandmothers could provide the child with stability. The mere fact the court viewed this factor as a neutral one does not mean it abused its discretion in this case.

Another claim by M.F. and R.D. is that the decision to place the child with R.T. constituted a "new placement" where there was "no need for a 'new placement.'" R.D. also argues that since the juvenile court terminated reunification services to C.T. at the same hearing, the placement of the child with R.T. was effectively an adoptive placement. Citing our decision in *In re Lauren R., supra,* 148 Cal.App.4th 841, he contends the relative placement preference does not apply in this circumstance.

Both of these arguments misapprehend the status of the case when the juvenile court issued its placement ruling. From the beginning of the case the juvenile court had ordered placement of the child with SSA (*In re Cynthia C.* (1997) 58 Cal.App.4th 1479, 1489-1490), not M.F. (*In re M.L.* (2012) 205 Cal.App.4th 210, 224 [minor residing with grandparents "in an emergency placement" is "not the same thing

9

as an ordered placement with the grandparents"]). Tzeng testified, and the trial court found, "the supposition before the child's birth was that the child was going to be placed . . . with the . . . maternal grandmother." However, because R.T. lives in Oregon, it was necessary for SSA to request authorization for an ICPC assessment of R.T. before the child could be placed in her care. That assessment took time to complete. Meanwhile, SSA allowed M.F. to be the child's caretaker. This approach is statutorily authorized. (§ 361.3, subd. (b) ["Consistent with the legislative intent for children to be placed immediately with a responsible relative, this section does not limit the county social worker's ability to place a child in the home of an appropriate relative or a nonrelative extended family member pending the consideration of other relatives who have requested preferential consideration"].) Only after the ICPC assessment was nearly completed did M.F. formally request that she be considered for placement of the child.

Further, the need to make a formal placement ruling in this case was necessitated by the fact M.F.'s section 388 petition for modification of the initial order placing the child with SSA. Thus, the juvenile court's placement ruling at the six-month status review hearing was not a new placement.

R.D.'s adoptive placement argument lacks merit as well. Both M.F.'s section 388 placement petition and SSA's application to place the child with R.T. were filed during the six month review period while C.T. was still entitled to reunification services. It was the juvenile court that ordered these matters combined with the six-month status review hearing. Further, the juvenile court made its placement ruling *before* it terminated C.T.'s reunification services and scheduled a permanent plan hearing. (*In re Joseph T.* (2008) 163 Cal.App.4th 787, 795 ["Appellate court decisions have consistently held that the relative placement preference applies at least through the family reunification period"].) Thus, this case is distinguishable from *Lauren R.* and the other cases cited by M.F. and R.D. to overcome the juvenile court's reliance on section 361.3's relative placement preference finding.

10

Finally, to a large extent, the arguments of M.F. and R.D. amount to an attack on the sufficiency of the evidence to support the juvenile court's decision. Contrary to their claims, the issue is not whether R.T. could properly care for the child. The juvenile court found that placement with either grandmother would be appropriate. The question is whether the evidence fails to support the juvenile court's conclusion that it would be more appropriate to place the child with R.T. so that the child would have an opportunity to live with her half-siblings. "'The reviewing court must consider all the evidence, draw all reasonable inferences, and resolve all evidentiary conflicts, in a light most favorable to the trial court's ruling. [Citation.] The precise test is whether any rational trier of fact could conclude that the trial court order advanced the best interests of the child.'" (*In re Robert L.* (1993) 21 Cal.App.4th 1057, 1067.) As the parties challenging the juvenile court's decision, M.F. and R.D. have the burden of showing the evidence fails to support the lower court's ruling. (*In re Geoffrey G.* (1979) 98 Cal.App.3d 412, 420.)

On the child's purported inability to handle a change in her routine, the evidence is to the contrary. M.F. testified she mentioned the child's "panic attacks" to a doctor. But he did not prescribe any medication, only recommended patting the child or hugging her, and suggested she might grow out of it. M.F. acknowledged she placed the child in daycare while at work and that the child "loves being around other kids." Also, the visits between the child and the maternal family went well without any problems.

M.F. and R.D. point to the fact that R.T. does not have formal custody of the child's half-siblings. But, again, the record showed R.T. has had custody of them since December 2012 and there had never been an attempt to remove the siblings from her custody. R.T. testified that she knows the family of the half-siblings' father and that he continues to have problems related to drug abuse.

M.F. and R.D. also cite to evidence that R.T. had previously allowed C.T., the half-siblings' father, and R.D. to have unsupervised visits with the half-siblings. The

11

juvenile court acknowledged this testimony, but also noted there had been evidence of questionable activity on the part of M.F.  As noted, the juvenile court concluded none "of these criticisms are to the point" and "f[ou]nd no fault with . . . either grandmother."

Under the circumstances, we conclude the juvenile court properly exercised its discretion in placing the child with R.T.

*2.  The Order Setting a Permanency Planning Hearing*

C.T. challenges the juvenile court's orders terminating reunification services and setting a permanent plan hearing.  Her petition contains two headings:  One asserting the evidence fails to support a finding that SSA provided her with reasonable reunification services; and a second attacking the finding that she failed to make substantial progress on her case plan.  But a review of the arguments reflect her sole complaint is that SSA failed to fulfill its obligations in providing services because she was incarcerated.  We conclude her arguments lack merit.

Section 361.5, subdivision (e)(1) generally requires an incarcerated parent to receive "reasonable services . . . ."  At the time of the jurisdiction and dispositional hearing, SSA recommended not granting reunification services to either C.T. or R.D.  While the juvenile court had discretion to deny services to C.T. because of her pretrial incarceration status (*Edgar O. v. Superior Court* (2000) 84 Cal.App.4th 13, 17-18), it chose to provide them to her in this case.

But "[t]he adequacy of a reunification plan and of the department's efforts are judged according to the circumstances of each case." (*In re Ronell A.* (1995) 44 Cal.App.4th 1352, 1362.)  Since the child is under three years of age, "reunification services [were] presumptively limited to six months." (*Tonya M. v. Superior Court* (2007) 42 Cal.4th 836, 843; § 361.5, subd. (a)(1)(B).)  Further, since C.T. was being held in protective custody pending trial on very serious charges, the scope of available services was very limited.  "In determining the content of reasonable services, the court

12

shall consider the particular barriers to an incarcerated . . . parent's access to those court-mandated services and ability to maintain contact with his or her child, and shall document this information in the child's case plan." (§ 361.5, subd. (e)(1); *Earl L. v. Superior Court* (2011) 199 Cal.App.4th 1490, 1501.)

The evidence at the six-month status review hearing supports the juvenile court's decision. To a large extent, C.T.'s argument is based upon viewing the evidence in the light most favorable to her case. This approach is contrary to the applicable standard of review. "'We review an order terminating reunification services to determine if it is supported by substantial evidence. [Citation.] In making this determination, we review the record in the light most favorable to the court's determinations and draw all reasonable inferences from the evidence to support the findings and orders. [Citation.] "We do not reweigh the evidence or exercise independent judgment, but merely determine if there are sufficient facts to support the findings of the trial court."'" (*Fabian L. v. Superior Court* (2013) 214 Cal.App.4th 1018, 1028; *In re S.C.* (2006) 138 Cal.App.4th 396, 415.)

At the very beginning of the dependency proceedings, SSA contacted the Orange County jail inquiring about what services would be available to C.T. and R.D. A jail official informed SSA that services were not available to either of them due to their protective custody status. C.T. confirmed this fact when she testified at the six-month status review hearing. Once the juvenile court ordered SSA to provide C.T. with reunification services, the agency took steps to prepare a plan. Thereafter, Tzeng reviewed the case plan with C.T., provided her with a parenting packet and gave C.T. a letter informing her to contact Tzeng if she had questions. In addition, Tzeng met with C.T. each month and ensured she received regular visitation with the child.

C.T. asserts SSA mailed the parenting packet to her. The record citation for this claim does not support her claim. Tzeng testified that she provided C.T. with a parenting packet. C.T. also claims SSA failed to provide her with instructions on what to

13

do with the packet. Again, the record is to the contrary. When asked if she gave C.T. "any instructions with the parenting packet," Tzeng replied that she "wrote" C.T. a letter "tell[ing] her to review the packet and let me know if she had any questions."

Another criticism C.T. asserts is that SSA failed to meet with her about the case plan. The record reflects an SSA employee met with C.T. at the hospital shortly after she gave birth. But the agency's jurisdictional and dispositional report notes that SSA "was unable to interview" either C.T. or R.D. because each of them invoked their Fifth Amendment privilege against self-incrimination. After the juvenile court ordered SSA to provide C.T. with reunification services, Tzeng did meet with her.

C.T. claims SSA failed "to adjust the case plan to include requirements that [she] could meet." But C.T. was incarcerated from before the child's birth through the six-month status review hearing. SSA contacted the jail about potential services for both C.T. and R.D. shortly after filing the dependency petition only to learn they were in protective custody and unable to receive services. As noted, C.T. confirmed this was the case at the six-month status review hearing. Under the circumstances it is difficult to think of how SSA could have altered the case plan to further assist C.T.

Citing *In re Ronell A., supra,* 44 Cal.App.4th 1352, C.T. suggests the juvenile court erred by failing to view the evidence in the light most favorable to her. This argument misstates the law. (*In re S.C., supra,* 138 Cal.App.4th at p. 417 ["Counsel should never misrepresent the holding of an appellate decision"].) *Ronell A.* held that rule governs an appellate court's review of the juvenile court's ruling on the adequacy of the reunification services provided to a parent. (*In re Ronell A., supra,* 44 Cal.App.4th at pp. 1361-1362.)

The facts of the present case stand in stark contrast to C.T.'s main case authority, *Mark N. v. Superior Court* (1998) 60 Cal.App.4th 996. There a father was out of custody when the dependency proceeding began, but a month later arrested and remained incarcerated until reunification services were terminated 17 months later. The

14

child welfare agency responsible for the case did not contact the father for seven months and then did so only by a letter. During 13 months of the entire 17-month reunification period, the agency had no contact with the father. Nor was there any attempt by the agency to contact the prison officials about the availability of services or to make any adjustment to the services in light of his incarceration. Thus, we conclude C.T.'s reliance on *Mark N.* is unavailing.

## DISPOSITION

The petitions filed by M.F. and R.D. challenging the orders denying her section 388 petition and placing the child with maternal grandmother are denied. The petition filed by C.T. challenging the termination of reunification services and scheduling a permanent plan hearing is denied.

RYLAARSDAM, ACTING P. J.

WE CONCUR:

MOORE, J.

THOMPSON, J.

15